Good morning, Glenn Dannis for Objectors, Bedolla et al. The case here is, or the appeal here rather, is really about a settlement that was created or that was entered into at a time when the plaintiffs in the case into which we moved to intervene were sort of limping into a very weak posture having lost class certification, having lost a motion for summary judgment, and really having bargained away or having lost any sort of leverage that they may possibly have had to have gotten a decent settlement for the class here. Wasn't that because their claims were weak? Judges had ruled against them? Well, that is true. At least one of the claims that they had, this wait and travel time claim, was summary judgment was entered against them on it and was on appeal. And I think another judge in another district ruled the same thing. That is true. At least that was represented in their papers. You've read the case. We have, and that's true. Our claims are actually not, our class claims are not really focused on wait and travel time claims. We actually have claims that arise from an entirely different nexus of facts. There are some overlapping claims. One of our main claims that we actually have the, that our clients have the right to go forward with on a class and representative basis is for this CDM claim. Some of your claims have to be arbitrated. The majority of our claims have to be in arbitration, but as the Court knows, arbitration is simply another form for adjudicating the merits of the claim. What's important is on what basis they can go forward. It can be expensive. It certainly can be, mainly for the defendant. But, and because there are rules as to the extent to which plaintiffs have to bear the burden of arbitration costs, especially in wage and hour actions and in class actions, those costs would be borne almost exclusively by labor ready. But in fact, these claims we have the right to go forward with on an aggregate basis. They did not, and at that particular moment in a position of utter weakness, accepted a settlement, which was really by any measure not in the best interest of the class and rife with, well, indicia of collusion as well as. Tell me about that. They represent, and I, that the settlement was based upon a proposal made by an independent, well experienced mediator. Is that accurate? It was blessed by a mediator. That's right, Your Honor. And I don't think it was exactly what the mediator proposed, but it was based upon what he proposed. Well, what evidence is that he was involved in collusion? Well, Your Honor, my answer to that would be several things. First, when there's a mediator involved in a case, that's only one of a number of different things. No, no, but a mediator is an independent person. It seems to me as a trial judge, if you have faith in the mediator, I mean, you are worried about collusion. I mean, that's a perfectly thing to be worried about. But if it's represented to you, look, we have come to this because of the posture of the case, because of the amount involved, because we are offering full restitution. Well, it's not full restitution to each member of the class, but average member of the class. And this is based upon a mediator's proposal. So it would seem to me that a district judge can say, you know, I'm satisfied that it's non-collusive, even though it's a million-some dollars going to the principal. Well, Your Honor, in this circuit, the Bluetooth case really speaks to these sorts of cases where you have Bluetooth actually dealt with the case where you have a pre-certification settlement. This is sort of an even more extreme example because this is a post-certification denial settlement. But what Bluetooth said was that if you have a settlement being entered into pre-certification, the court is supposed to look at a number of factors, one of eight being whether or not there was an ad. Those eight factors really don't help you. Well, we don't really know because the district court didn't make any findings on them. And, in fact, one of those factors is the value of the settlement. And in this case, not only didn't the district court make any findings with respect to the value of the injunctive relief or what value the class got, but as we pointed out and as we pointed out to the district court, the value that the class got, what the class actually got out of the settlement, which there's quite a bit of case law that says that that's an important factor, was completely obfuscated. Counsel, I've got a couple of questions on that point if I can interject. Absolutely, Your Honor. One, I'd like you to advise what's the relationship between the amount of attorney's fees which are given, which I think was $1.25 million or something like that. It was $1.125 million, Your Honor. Okay. Then how does that compare with the expected amount that's going to go to class members under claims made? Well, thank you very much for pointing that out, Your Honor. In fact, under Bluetooth, one of the main badges of collusion that we're supposed to look at is the relationship of the attorney's fees and the expected attorney's fees to what the class relief is. In this case, the attorneys are getting, I believe, three times or almost three times as much money as the class is getting in relief. And in fact, as we pointed out in our papers and we pointed out to the district court, in this particular case on these facts where you have the lowest paid workers, transient workers, 210,000 of them who generally work for a very short period of time, there was a very low expected participation rate. And even though it was hidden from the district court, that very low participation rate actually came to fruition. Seven percent of the class participated in this egregiously low settlement, which was entirely expected, which is why there was a complete reversion not only of the class relief but of the attorney's fees. They've already got to keep everything. I have two other related questions. The second one is what's the relationship between the amount that class members could get if they made a claim and the amount given to the class representatives, their incentive fee, in terms of a multiple? I believe we pointed out it was 500 times. I'm sorry. It was between 500 times and 200 times, I believe, what the class members. So in other words, here Jeffrey Allen was faced with the possibility of either participating at a $25 rate or getting $5,000 after his claims were completely eviscerated and he was left with an individual claim if he decided to bless the settlement and go forward with it after they had lost basically every possible bit of leverage that they could have had. So, Your Honor, knowing full well the Radcliffe decision, which Your Honor authored, in that case one of the main points that I believe the court made was when you have that large disparity, there is certainly a, it should be a red flag to the court to take a hard look at what's really going on. Certainly in this case, in the mosaic of facts that we've pointed out, where you have that great a disparity between what a participating class member would get and what his service fee award would be, where you have such a low participation rate, where you have a full reversion, where you have a settlement entered into after certification has been lost, after MSJ has been lost, and after a motion to compel arbitration was lost, after all of those things, this is really an anomalous, very, very extreme situation. So Your Honor is correct. And, in fact, as Your Honor also knows, that provides a basis not only for finding that the class rep was inadequate, but finding that class counsel was inadequate under 23A4. Yeah, and I don't know the ultimate implication of it, but it's at least a basis for a searching inquiry by the district court. Absolutely, Your Honor. Let me see if I understand this reversion point you made. The attorney's fees were based on one-fourth of a $4 million fund, correct? One-fourth of a $4.5 million fund, Your Honor. Okay, one-fourth of a, yeah, my math must be rusty, okay. One-fourth of a $4.5 million fund. And do I understand that if you take out of that fund, you subtract the $1.25 million for attorney's fees, and you subtract the amount of claims actually made, which you estimate are in an amount of $300,000 or $400,000 or something? At the very most. Okay. What happens to the rest of that $4.5 million? All to Labor Ready. Okay, so then what's the amount of the settlement that's actually being made? They're getting an eight-year release from 200,000 employees for about $1.6 million actually paid out, and the vast majority of that being in attorney's fees. I thought your school's question was, aside from the attorney's fees, what was the amount that would be not returned to Labor Ready? Right, so if you subtract from the $4.5, the $1.125 in attorney's fees, the amount going to the claims administration process, the small amount going to the state for PAGA, and the service award, the rest of that would equal about $3.3 million, and of that amount, most of it, other than the $374 or less, would be going back to Labor Ready, if I've answered the question that was posed. Now, we have this requirements of Bluetooth, which maybe put a spin on factors looked at in other circuits when you have one of these settlements when a class hasn't been certified. Were any findings made by the district court on the value of the injunctive relief, that is that Labor Ready changed its way of doing business? Did the court give a finding with values of that? Not at all, Your Honor. It was pointed out, and there was some discussion about the injunctive relief, and I believe at one point during one of the hearings, as a rhetorical question, the district court said it believed that some of it was valuable, and that was, I believe, what Labor Ready pointed out and said, aha, there's been a finding. There was no finding whatsoever regarding what that was actually worth, or in fact, How would you value that? How would you value the no longer using the cash machine, or whatever, and reverting to a man now and adopting getting rid of those machines and actually providing for electronic payment? How do you value that? Well, if it was our case, we'd probably have an expert and submit an expert declaration explaining what that was worth. How would the expert approach that issue? I realize this may be inconsistent with Bluetooth, but the whole purposes of the $5,000 for four-year litigation seems to me to be in the ballpark, and I don't even know what the value of his claim as opposed to the class member's claim. I don't think it's in the record. Secondly, the role the incentive provided to plaintiff's counsel to get people to change questionable business practices is worth something. I mean, this really goes to the three. All of this goes to whether the name class rep got too much, and I understand the posture of the case. May I hear you? Okay. But $1,250,000 for a change in questionable business practice seems to me to be a very reasonable and adequate. And if they can't track down who these transient workers are, I don't see how you can either. Right. Well, I guess my response to that would be a couple of things. One is that what we're talking about here, the real crux and one of the main points of the objector's claims or the objector's arguments is that we have claims that were released for $0 and that $0 in any kind of relief, including injunctive, were given. Our meal break, rest break, and 2802, that would be business expense reimbursement claims, all of those are claims that weren't even pleaded, but our clients actually have. I mean, this goes to the heart of our sort of conflict of interest argument. But, in fact, there was at the end some injunctive relief tacked on for that, which was that their employees would be trained to follow the law, which, as we pointed out in our papers, is not, in fact, injunctive relief at all, even if you take apart the fact that there's no – that there's been no authority given to oversee the injunction or anything like that. It's not actually worth anything. So setting aside the discussion of injunctive relief on the CDM claims, the injunctive relief on our claims was worthless. On the CDM claims, the district court really made no findings whatsoever, and one can assume it might be worth something. But under this circuit's precedent, under Bluetooth and under Radcliffe, where you have conflicts of interest like there are here, quite clear ones, and I'm not aware of any other appellate cases where you had sort of this kind of – What was the value of Mr. Allen's claim? I believe if he participated in their settlement, it was worth $25. If he – What was the value of his individual claim? Is that in the record? I – I mean, if you – would be whether he had a claim of some amount on his individual claim. Right. Well, his claim, I believe, would be worth very little, $25 or some amount like that. And that was, in fact, what he was left with at the time when he was faced with the choice of – Four years of the irritation litigation. Well, I don't know how irritating it was. I think he sat for a post-certification deposition that appears to have been sort of added on for reasons that we don't know. But there was – he did not sit for a deposition at the normal time, which would be prior to a class cert brief. He did not – the record doesn't show – the record below doesn't show that he really did much of anything. So, you know, I don't know. But, you know, but Your Honor's point about the service award of $5,000, yeah, the service award of $5,000 in the abstract, there's nothing wrong with at all. What we're saying is here, especially when viewed in these facts, it's inappropriate, and especially under this circuit's precedent. It definitely makes a – it, you know, raised a red flag that the district courts really should have honed in on, and it wasn't entirely the district court's fault because a lot of the most important facts here were kept from the district court. Like the fact – The court's fault for not asking the right questions. Perhaps the district court should have asked better questions, and we did try and bring these things up, and I understand that there are a lot of different factors at work here. But, yeah, under Bluetooth, under Radcliffe, under AmChem, and under out-of-circuit cases like Dewey, when you have this kind of conflict of interest, and these kind of badges of collusion. What kind of conflict? Well, the conflict of interest is that you have class members who have different interests, sharply different interests and incentives, than the class rep and the class rep's attorneys, which is that some of the class members here, like our clients, the objectors, have the ability to move forward on fully aggregate claims. They have class action claims for meal break, rest break, and business expense reimbursement claims. Whether or not they've actually been certified is a non-issue. The fact is they have the right to move forward with aggregate claims, and as any class action lawyer knows, that is one of the main origin points of any kind of leverage to have a decent settlement is the fact that you have the right or the potentiality to impose aggregate liability on the defendant for a massive class here. So our clients have those claims. It's a class that's massive in number but not in practicality, based upon your own presentation. Well, we've said nothing about the merits of our claims. Our claims have not been, there have been no findings on them. So you think more people would respond to your class notice than would respond to the settlement? Well, I think that there can be no doubt, and it certainly wouldn't be less. It would be difficult to find any approved settlement where you have fewer people participating than this one. I realize that I'm running short on time, and if your honors have any more questions, I would reserve the rest for rebuttal. Which of your class claims were forfeited as a result of the settlement? All of them. If this is not overturned, all of our claims, that we have four cases, three of which are going forward on an aggregate basis, will be wiped out. And were those claims identified? Yes, they were clearly identified. I mean, in your opponent's class action? They were identified in the release as it's in the court's final approval order. They were not identified in the notice to the class, but they were certainly made clear when it came time to have them wiped out by the court. Thank you. We'll give you a little more time. All right. Thank you very much, Your Honor. Since we're giving you more time, and they will address it, I'm curious, the people who were in your firm, and that certainly indicates the problem of parachuting, but you think it's totally irrelevant. Is that correct? Are you talking about their sort of ad hominem attacks against our firm? Exactly. I don't believe that those are relevant here at all. Not only didn't the district court make any findings on them, and they were essentially shoehorned into that. But it does show the problem of parachuting, of coming in after the settlement's been reached and trying to feather your own nest. We were involved in this case for years prior to the settlement having been reached. So we did not – this was not a case where we filed it. And how did you become involved in the case? How did my firm become involved? Yes. Was it by reading – you filed four class actions in state court. Is that right? We did. And did you come up with that idea, or had the first case been filed first, and did you review the complaint and then come file your class actions in state court? Well, I can't speak to the origin of that. It might be important in terms of what your work was and whose brainchild this was. It might be. Did you simply copy in the state court class actions what had already been alleged in the federal court actions? Our claims are distinct from theirs. I understand that. That's not my question. If you're asking whether this was an original idea to sue LaborReady, I don't think it was for them either. There was a Fourth Circuit case, Adkins, against LaborReady in 2002. So the idea to sue LaborReady, we didn't come up with it ourselves, but we were contacted by clients and sought different claims than the ones that are at issue here. And I also don't believe it was in the record or brought up in the district court. Thank you, Your Honor. Good morning, Your Honors. It's an honor and privilege to be here. David Ongaro on behalf of LaborReady. I think you have to look at the big picture here on this settlement. And the big picture is all the relief that the plaintiffs got in this case. Was there monetary relief? Yes. Was their monetary relief huge? Are these folks going to get rich from it? No. But that's based on the value of the claims that were at issue. They have one extra claim, which is a meal break claim. And I'll talk about that later. But let's talk about what were the claims at issue. We had a waiting time claim, a travel time claim, and expenses in traveling back and forth. Now, the Department of Labor has already ruled, and this is... And the cash claim about... Well, yeah, we'll get to that one as well. That's the secondary. This is LaborReady. What they do is they give people temporary work at different locations. So the old process was you'd have to come into the LaborReady office, seeking work, sit there and wait and see if a job came up, and then go out to your job site. And they were claiming that time waiting in the office and the time traveling back and forth should be compensable. The Department of Labor handbook says, specifically, temporary labor agencies who work like this, the travel time and the waiting time is not compensable. The Bernal Court found on summary judgment that time is not compensable. Judge Pragerson, in this case, found it not compensable and issued summary judgment. So they say, oh, we have these claims. They're valuable. But how would those claims have any different fate than the claims that occurred here in Allen and occurred in Bernal? The law is clear on those issues. We've won summary judgment, and the Department of Labor is as clear as can be. Those claims don't have monetary value to them. Now, the CDM claims. Let's talk about that for a second because they had the CDM claims, and so do the plaintiffs on this side. The CDMs were put in place by LaborReady because a lot of our workers don't have – Whatever. They're gone. Okay. Yeah. We took them out. And let me say this. It's not like we made money on them. The reason we put them in is because our workers didn't have relationships with financial institutions and couldn't get their checks cashed. Now, if you look at the ruling from the Santa Clara court, Superior Court in Santa Clara, they found under the same theories, the same labor code sections, 212, that the cash dispensing machines were, in fact, legal, a benefit to the employees, and should remain on. And why did they find they were legal? Why did they find they were beneficial to the employees? Over a thousand employees stepped up and said, these machines are beneficial to us and they shouldn't be taken out because it's going to be a financial hardship for us. Same thing happened here. The court there said, not only is it not illegal, the machines need to be kept on, and we agreed to a stipulated judgment that they would be kept on and charged the same fee. Then we get the second suit that comes from the Allen folks. So we take the CDMs out. And also important is in the record, there was a bill that the Senate here in California tried to outlaw the CDM machines. And you'll see in the record there's a letter from Governor Schwarzenegger saying, this is directed directly at LaborReady and I don't find it to be valid, and I'm vetoing the law. So where is the value to the CDM claims? Again, one court adjudicated they were valid under the labor code, and the Senate tried to pass a law to change that, which was vetoed. So where is the value there? The real value in this case for the class members is the injunctive relief that we gave them. And I want to go through that with you in detail. What we did was we replaced the CDM machines with pay cards now. But the district court never valued it. I don't know how you can, quite frankly. I have problems too, but I'm not very magical. Well, I mean, but what do these pay cards do? In the old days, the LaborReady employees get paid that same day, would have to, after a full day of work, would have to travel from the job site back to LaborReady to get a check, take that check, go back to a bank and cash it. What's that take? Hour? Two hours? Three hours? It depends on the employee and where all these locations are. What do they have now because of these plaintiffs? They have a pay card in their pocket, they finish work on their way home once the supervisor at the job site says to LaborReady, yep, work was done, here's the hours. That card is loaded up with cash and it can be used like a credit card anywhere else. That's a substantial benefit to these employees. It could save them anywhere from one to three hours a day in collecting their pay. How do you value it? Hard to say. And I think Judge Mercer. Counsel, when you say it's hard to say, are you suggesting that there couldn't be an expert witness who could put a value on that? Well, I don't know how you could on a class-wide basis because it would depend on such a variety of factors to come up with a dollar figure for that. It would depend on how long does it take the employee to get from the LaborReady branch to a place where he could cash a check in the first place. So how much time savings is there going to be? I mean, certainly convenience to the employees, clearly. There's a huge convenience to the employees. But I just, you know, in today's day and age you can get an expert to opine about anything. Whether the opinions are valid or not is another issue. But I just don't know how you would go about dissecting that on a class-wide basis for 200,000 people. What is really the dollar value to that? I think it's nearly impossible in my opinion, but I could be wrong. The second thing that we did was, which is very, very important, is we now dispatch differently. We've gone to electronic dispatch, which means instead of coming into the branches and waiting around for two or three hours waiting for a job, people can sign up with us and we'll text them jobs. And the system is so sophisticated that it knows where the employee is, it knows where the job is. So it'll sign employees to jobs that are very close to them. And the employee has the right to say, no, I don't want that job, I'll reject it. But in the morning, instead of getting up at 5 a.m. or 4 a.m. and getting to a labor-ready office, they can sit there, they can get it on their phone, boom, there's a job here, would you like it? Here's the pay rate, here's the type of work, do you want to accept it or not? Again, huge savings for the employees. You're not getting up at 5 in the morning and going to a labor-ready office, you're getting a text on your phone. How do you value that? Again, there's a huge time savings, you don't have to take public transit or drive, so there's some transportation costs that are saved, but how could you ever put a value on that? I don't know, I just don't know. But that is a significant sea change in our practices, which costs us a significant amount of money to put that in place, and it certainly costs us money to have the pay cards in place, which we bore as part of the settlement. So the injunctive relief, the value that the employees got... Did the district judge ever ask you how much it costs to institute those two practices? Well, I don't know, we didn't have the numbers at that point in time as to what the total price tag was going to be. I'm not asking you what they are, I'm just asking you... I don't, I suspect we do, I have never seen any numbers like that, but it wasn't something you could turn on like that. Obviously a program had to be written, developers had to be hired, the whole process had to be gone through. But is that a benefit to the employees? That's a huge benefit to the employees. Now they also claim, well gee, we didn't have... Can you counsel on that point if I could interject? Of course. I don't dispute that there were, I'm sure there were some big benefits to the employees, but what's troubling me is whether, although I also know it's a fine district court judge, but was the process followed adequate here? Was there a searching inquiry about the factors that go into this settlement that's sufficient to satisfy Bluetooth? Well, I think we disclosed to him what we were going to do, and he looked at it and there was discussion of it at oral argument, and I think for Judge Pragerson, he saw all of these factors, was weighing that against the minimal claims that these folks have and the value of those claims and said, I can't speak for him, but from what I gathered from the oral argument, he was satisfied that the injunctive relief by itself would be enough to carry the settlement. But the problem on that, for me at least as one judge, is there was no value put on the injunctive relief. And you've argued pretty much like, well, you don't know how a value could be set for it. And we have lots of different kinds of cases where very indeterminate figures are set with findings of an informed district court. And so I'm sort of questioning in my mind, is it really impossible to put a value on the injunctive relief? Well, I think at the time that we were there before the judge, we certainly didn't know what the internal costs were going to be, and that would be a factor in what was the total value of that settlement. And I think what Judge... What's the relationship between the cost to the employer and the benefit to the employee when you value injunctive relief? I suppose it cost you $100 to do it, but it was a million dollars worth of benefit to the employees. I mean, you described all the benefits. They don't have to come in. They get their calls on the phone. Well, some expert comes in and says, well, that's worth a million dollars. And you did that by just putting a little card into something, and it wasn't a big deal to you, which is important. You all may have a value, too, because your competitors may be doing that, and that cuts both ways. Right. I think they both have value, Your Honor. I don't know whether you have Uber on the West Coast. We do. Uber is better than taxi cabs. Right. And I think to answer your question, Your Honor, I think both of them have value, and I think both of them have to be considered in the settlement because we agreed to do these things as part of the settlement. So our internal costs have to be weighed along with the benefit to the employees. Well, I have trouble, I guess. It must be that you have to do it because of the law, but I have trouble with these class settlements. And knowing how much, it's usually not that the individual employees get $10 or $20 or $30. The real value of these class actions is that it causes a change in practices which are of tremendous benefit to the public and to, of course, the members of the class. And I suppose the courts these days think we have to find a way to measure that benefit. But I have some doubts, as you seem to have, about how accurate an evaluation we can get of the benefit of these important changes. I agree with you completely. And the plaintiff's, well, the objector's argument was, well, gee, these were required by law. But we weren't required by law to give pay cards. We could require the employees to come back and get paychecks. That policy had already been held by two courts to be consistent with California law. You may have been required by the market, but you weren't required by law. That's right. And we certainly weren't required by law to text folks with job offers. That practice that we had before was valid under the law. I see I'm probably running out of time, but I do want to give the plaintiff's attorney a chance. Let me ask you one other question. Sure. And we'll give your co-counsel time. What elements that were not covered in your suit would have been covered in theirs that were cut off? There's really only one claim. They claim it's two. They claim it's the expenses traveling back to the labor-ready branch and to the job site. But that was cut off by summary judgment anyway, so that would have been eliminated because that time was not compensable, so expenses incurred there would not be compensable. The second one was meal breaks, and you bring up a good point. And this is information that we gave to Judge Pregerson. They have two folks who claim to have meal claims, Mrs. Bedolla. Mrs. Bedolla's case is now in individual arbitration. We took her deposition. At her deposition, she said, I got every single meal break when I worked for labor-ready. In an errata sheet— What is the meal break? I don't understand. I know there's a meal break, but at the job site? At the job site, the customer job site, which is the next point I'm going to make, which is how in the world could you ever certify a class when we're sending workers out to 1,000 different job sites in the state of California on any particular day for 1,000 different customers who are working different hours on different crews in different industries? That would be impossible to certify. But Mrs. Bedolla admitted in her deposition, I took every single meal break. And what they did to try to— Why would you be responsible for the meal break? Oh, no, no, they work for you. They were joint employers in essence. But what they did to try to revive Mrs. Bedolla's claim is after the deposition, they served an errata sheet where she changed her testimony from, I get a meal break every day. That's how they tried to save it. And is that claim an arbitration or is it— That claim is an individual arbitration. The second case that they—the second individual they have who had meal claims supposedly was Mr. Alvarez. And when I questioned him at deposition, and this again we discussed with Judge Pregerson, he said to me, well, I was working for Labor Ready at a manufacturing plant, and they would have a bell that would go off for lunch, and all the workers would go to lunch at the same time. He goes, but I wouldn't go. I'd keep sweeping because I wanted to get a permanent job, and I wanted to show the employer that I was a hard worker. Well, under the Brinker case now, we have to provide meal breaks and let the employees know they're entitled to take them. If they choose to continue working through their meal break, that's not a violation either. So despite the fact they claim to have these—these are different claims now, these meal and rest breaks, they don't actually have them based on the testimony of their own clients. And what did we do in response to that? We're auditing. We're making sure that folks take their lunch breaks. And we had this in place before. When they come back at the end of the day, they had to check a box saying they got their lunch breaks. And Alvarez said, one day I told the Labor Ready folks that I took my lunch break five minutes late. And I said, what happened? And they said, the very next day Labor Ready went to the customer and said, hey, he's claiming he got his lunch break late. We have to make sure that we're doing this correctly and went over with the customer the requirements under California law. And so while they claim they have these separate claims, they're not going to be—they're not supported by the facts, number one. Number two, we gave injunctive relief on the meal and rest periods. We have given all the employees little cards which explain what their meal break and rest break rights are. That's valueless because all you're doing is obeying the law. Well, no. We are obeying the law, but we're training our employees to be able to help us audit our customers, which is an added benefit because if something's out of whack, we want to go fix it. Nothing says we have to train our employees on meal breaks or give people cards. This was above and beyond. And the other things we agreed to do on the meal breaks were— Well, if that's what it takes to get you to comply with the law, it may be that you have to do it. Well, I would agree with that, but I don't think the law would require us to do what we did. We certainly have to comply with the law. And certainly training our customers and doing the audits that we have agreed to do in the injunctive relief eliminates whatever potential meal claims they would have, which don't exist anyway. And we had talked at length with Judge Pregerson about the claims of Ms. Padola and Mr. Alvarez, so he had that information in front of him. Help me out. I just have a tough time envisioning this. If the class action is not approved, if we reverse—I mean, I take it if it is approved, they are free to opt out and pursue their individual claims, which probably aren't worth pursuing. Absolutely. If the class is not approved, if the settlement is not approved, what happens? Well, I think we have a huge problem here because we've already done the injunctive relief that was required under the process. But in terms of they pursue some claims individual and some in class and arbitration, is that right? Right. Well, nothing's been certified. There's no class case at all. They have the right to make that motion, but there is nothing certified at this point. But the problem is this. We're now so far out. I mean, we shut off the CDM machines in 2010. We started this new practice. The only people that they could reach would be people who were way back when in their statute of limitations. And so you're going to get a group of people who are now— Well, you've just touched upon something which worries me. No class has ever been certified. That's correct. So why hasn't limitations run as to all potential class members who did not— Maybe I'm wrong. I thought that there's tolling when, at least under California law. There would be, in my opinion, as I understand California, there is no tolling at this point. Until there's an actual certification. That's right. That's right. So I think you're right. I think what ultimately happens is we're going to be left with a whole bunch of statute of limitations issues. We're not going to be able to find most of these folks because it is a fairly transient workforce. And we're going to be stuck in a situation where these folks who have made claims may never, ever get paid, and we may never hear from them again. They may never get the $10,000 to $25,000. That's right. That's right. And one more— It wouldn't be any great tragedy. Well, if someone wants to give me $25,000, I'm happy to take it. One other thing that I think is very important, and something they've put in their brief, the most valuable claim out there was a PAGA claim based on the CDMs. Because PAGA has those pretty stiff penalties. What's PAGA? The Private Attorney General Act of California. And that has— Private Attorney General, what's GA? I've had the same question. Private Attorney General Act, PAGA. Under that statute, you get damages of $100 for the first violation and $200 for every subsequent violation. And we're dealing with a lot of people. PAGA is a penalty, so there's a one-year statute of limitations. They don't have any PAGA claims based on the CDMs. The only one who has that is Mr. Allen. And that's really partly why the settlement is what the settlement is, that there's any value, any money put on it was because of those claims. They don't have them because their first filing on a PAGA was November 2011. I don't know how PAGA works. Some money goes to the state. That's correct. And in the settlement, some money does go to the state. How does it work? It's $100, then— of the recovery is supposed to go to the state and $25 to the aggrieved employees. And so the most valuable claim that really drove the money in this case, these plaintiffs don't have because their first filing with a PAGA claim was November 2011. We shut the machines off October 2010. PAGA claims are derived only from the machines? No, they derive from the labor code violations as well. But we're not worried about those because we've already been adjudicated on all the labor code violations in the summary judgment. So the PAGA was really the driver. These guys have it. These folks don't. I'll let Mr. Sateros speak now. Thank you very much for your time. Well, it says 42 seconds, but— Thank you, Your Honor. How much time do you need? Just a few minutes, unless you have some additional questions based upon my comments. I just wanted to address the Rule 23H requirements under FRCP 23H regarding the timing of the notice for seeking attorney's fees, costs, and class enhancement award. The appellants indicated that 23H wasn't complied with in accordance with the in-rate Mercury decision because the fee motion wasn't filed prior to the objection deadline. The notice itself says, is the settlement final? The settlement is not yet final. The court has scheduled a hearing for 2013 to consider whether to approve the settlement and request by class counsel for attorney's fees of 25% of the settlement and costs no more than $50,000 and payment to Jeffrey Allen. You can appear at the hearing, but you don't have to. You can hire your own attorney at your own expense, and this is probably the most significant aspect of the notice in relation to this issue, appear or speak for you at the hearing. So in relation to complying with 23H and giving class members the opportunity to object to the motion of fee award, they had three weeks, which was three weeks prior to the final approval hearing to object to the motion of fee award. I'm not sure it's relevant to anything, but the big picture is, is the representation correct that there were four or five wage and hour firms on the class side? Yes, there was, Your Honor. And in relation to the meal and respite claim, Your Honor indicated... So they reviewed, they had an opportunity to review the merits of the trial rulings in your favor. They did. They did. And one other issue that I wanted to point, which you had indicated, is this case is not necessarily about the appropriateness of the settlement in relation to the appellant size, because Mr. Thierman submitted a declaration indicating that unless they receive 50% of the attorney's fees, per se, the settlement was no good. They knew that there's going to be a reversion. They knew how many people were going to be members of the class. They knew all of these things. They told us that, and they wanted to, you know, essentially make money out of this case. And if that issue... And that's what occurred, Your Honors. This isn't about... That happened in the past. If this settlement was fine then, the only reason why it's not fine now is because they're not participating in the attorney's fees here. Counsel, Judge Gould, if I could interject a question. It's sort of the personal challenges don't impact my thinking much. What I'm interested in the substance of this is, do you agree with Labor Readies Counsel that there's no way to put a value on the injunctive relief? And the reason I ask that is a lot of the description of the value had to do with saving time for class members. And as the class counsel, I guess I wonder, is there not a way that an expert witness could put some value on the saved time for members? For unemployed people. I'm not sure whether or not an expert witness can set a value for that time, specifically because Judge Klausner denied class certification. Judge Klausner denied class certification in part because he could not satisfy, or the plaintiffs in that case could not satisfy Rule 23 in terms of the predominance issue. And part of the predominance issue is to be able to identify and provide a damages model for that case. So if Judge Klausner said that it couldn't be done, why could our expert witness do the same thing? One other issue that I wanted to... Well, you know, it's not really my job to try to answer your question. I don't think I will. No, that the counsel for Labor Ready said that there were certain benefits in people getting texts or notice at home so they wouldn't have to drive in if they had a job. And, you know, I don't understand why someone couldn't estimate an average number of hours these impacts save and put a dollar value for the workers per hour. It's possible, Your Honor. I mean, I presume that it's possible to do that. In relation to that note, I would... Is time spent traveling for an unemployed person worth more or less than sitting on a couch? As Mr. Ungrow indicated, the time spent traveling... I mean, obviously, the time spent traveling is worth something. There's a value associated with that. Maybe so, maybe not. What in a nutshell, what... Because we've already taken you over your time, but that was in part because of Labor Ready's argument. But if you had to, in a nutshell, say from your perspective, how would you describe why you would contend the district court made an adequate searching inquiry consistent with Bluetooth? We provided a lot of evidence to the court. Mr. Garrett, who's here in this courtroom, who's inside counsel for Labor Ready provided a declaration under penalty of perjury explaining all of the material changes made in relation to the practices. But did he explain the value of it? There was no finding of value on that. And I think some amount of deference should be given to the trial court judge in relation to gauging the benefit to the class as opposed to necessarily putting a value on it. In these class actions, usually we place a value, well, this cost class members X, this cost class members Y, this cost class members Z. An injunctive relief, how do you really place value on that? It's difficult to do. Is it necessary? Our belief is that it's not. And our position is that the discretion should be given to the trial court judge in order to assess the magnitude of benefit to the class. But the trial court does have to ask the right questions. Correct. And I think based upon the record, the trial court had before it all of the material changes that were made to the policies and practices in relation to the claims pled in plaintiff's case here. To what extent can the trial court take into account the amount paid in attorney's fees? If you accept it to some extent for small claims which aren't worth litigating unless they're aggregated. The trial counsel has provided value. It has itself provided value by accomplishing a change of purpose, a change of business practices. The attorney's fees issue I think is more of a two-pronged analysis. I think irrespective of the injunctive relief, 25% based upon the common fund, based upon the U.S. Supreme Court decision of Boeing v. Van Gemmer, where a fund was created by class members and not everybody filed a claim. And the U.S. Supreme Court said the fund was created irrespective of the number of claimants, 25% or percentage of the recovery of the entire. In this case, 7% or 8%. In this case, there's 7% or 8% claimants in this case. To what extent would it be more honest? I mean, taking a presumption of 25% of the fund to say, look, the attorney's fees of a million and a quarter were reasonable. I mean, in terms of accomplishing the purposes of the class action to begin with. These claims would never have been filed individually but for the threat of a class action. The lawyers added value, added public value by accomplishing the change of business purpose. And so, therefore, these artificial, of course, it's a good benchmark to have 25% of the fund. But rather than trying to jack up the value of the class fund to say, look, a million and a quarter is a lot of money and it's not unreasonable, it's not an unreasonable payment to accomplish that. Can a district judge look at it that way? A district judge can look at it that way. And there's no reason not to. There's substantial benefit in relation to policies and practices changed by the company in relation to what they did on a daily basis. I don't know if Your Honors have any additional questions. I think you've answered my question. It's a challenging case and I don't know if you're familiar. I wrote an opinion on a case called Laguna on a class action settlement and had a vigorous dissent from one member of the panel on issues of whether there were adequate findings on value of injunctive relief. So I think it's a difficult question. Thank you, Your Honor. Thank you. All right, thank you. I just have a couple of big picture issues and then I'm just going to respond to a few smaller or more discrete issues. With respect to the larger issue, I would say that Judge Gould is correct, I think, in suggesting or in his questioning as to whether or not the district court conducted this circuit's required inquiry under Bluetooth. I don't believe that that was done. I think it would be very difficult to read the transcripts from those hearings and come out otherwise. I would also point out, as another kind of big picture issue, that under the Dewey v. Volkswagen case, which is from the Third Circuit, but which we cited in our papers and is consistent with AMCAM regarding conflicts of interest, under 23A4, the linchpin of the adequacy inquiry is the alignment of interests and incentives between the representative plaintiffs and the rest of the class. Here, we have shown that there is a misalignment of the interests between the class representative, Jeffrey Allen, and class members who have the ability to go forward on an aggregate basis on discrete claims that are going forward in some equal but separate forum, in arbitration on an aggregate basis. Let me ask you, I can't remember if I asked you before or the defendants, what happens if we disapprove the class settlement? What we've asked for, well, the settlement and then, of course, by relation to it, the fee award would be reversed. No, no, no, sustain your objection. What happens? Right, so if it went back down and the settlement was undone, we would move to intervene. Hopefully, our motion to intervene would also have been the denial of it would be reversed. We would intervene and we would look to be appointed interim class counsel and attempt to make sure that this settlement doesn't go forward and that a result happens or that the class, you know, we figure out a way to coordinate these different cases so that the class can actually get the relief to which it's entitled. 200,000 low-wage workers not just getting $10 or $25 but actually getting something. Why is that in the public interest and not in your interest? Well, there's an alignment of our interests. We have clients and our clients have the ability to, I mean, to these. What claims do they have? They have meal, they have rest, and they have business expense reimbursement. I would just point out that opposing counsel said that we have one claim. We have meal, we have rest, which is something that was left out of what they just had to say, and also business expense reimbursement claims, which are not the same thing as wait and travel time. Wait and travel time is about hours worked. It's about compensating for time. Our claims are for the value of money expended out of pocket for business expense reimbursements. It's entirely different in the Gattuso case from the California Supreme Court makes the distinction. I would also just point out that on this parachuting issue, we were contacted by class members to bring these distinct claims one year after. Our cases are not copycat cases. These are distinct claims, meal break, rest break, and 2802 claims. So those are not the same, and we did not just copy their suit. There was also, I just wanted to point out, that there was nothing in the record demonstrating that the mediator actually blessed the settlement. There was perhaps due to mediator confidentiality, there was not anything saying that it was blessed. There was simply evidence that there was a mediation. I just wanted to point that out. There's no evidence that in fact the settlement is based upon what the mediator, upon his proposal. I don't believe the record says anything about what the mediator said or what the mediator's actual proposal was. We also filed our CDM claim in our cases only after they lost class cert on the CDM claim, and after Judge Pragerson found their briefing to have been incomprehensible, saying essentially that it was unclear even what their motion was about. So after referring to their class cert papers as incoherent and incomprehensible, we then added the CDM claim, and that was the first time. With respect to the injunctive relief, that was only added after our objections and is only forward-looking. That does nothing to compensate eight years' worth of prior workers who've had their money, either their time not paid for or their expenses not reimbursed. It does nothing for that, even if it was intended to actually go to those claims. I don't understand what you're saying. I'm saying that the – oh, I'm sorry. Does the injunction have remedy past violations in any case? Well, it doesn't. We're just pointing out the obvious, which is that to the extent it's relevant, it does nothing for the class members who actually have lost money or not been compensated for their time, even if it were worth something. The injunction does have a future effect. Well, it does for people who still work there, but as they pointed out, most of the people who are our clients no longer work for them. So what about them? These people, your clients who work for them, can you locate them now? I can't speak to that. I know that our trial counsel, the people who are handling our trial counsel, my colleague knows a little bit more about the contact with them, but I know that Labor Ready must have records about their employees, and certainly there are ways – we had suggested, for instance, that notice be made by publication in order to make sure that it was better known and out there in the community because these are transient workers. I think that there was pushback on that, and they required that it be only by one postcard in first-class mail, probably the worst way to reach transient workers, and only after our objections did they add on that they would post something in their offices. But, yeah, I think the best way to reach these workers would be through publication. And finally, I would say that one of the reasons perhaps that there was no attempt made to value –  Where would you publish? Perhaps in a newspaper, maybe online on something like Craigslist where people who are looking for temporary work go to look for employment. And then I would say, finally, the great value of the injunctive relief regarding the CDM claim. One reason that perhaps it was not – there was no valuation given by the plaintiffs and none asked for by the district court as a consequence, or maybe not as a consequence, would be that it would have required Labor Ready to concede the massive amount of monies that it took out of people's paychecks to pay for the CDM machine for eight years going backwards. In other words, if they were going to say, here's the value of this, here's the money we're no longer taking from people, it would require them to do a calculation and probably come up with an enormous number that would also demonstrate what they had taken from their employees for the eight years going backwards. If there are any further questions, unless there are any further questions, we would submit. Thank you, counsel. Thank you very much, Your Honor.
judges: Motz, Reinhardt, Gould